UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA,

04 Cr. 447 (RPP)

- against -

**AMENDED OPINION AND ORDER**

ARTOUR ARAKELIAN,

Defendant.
---------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

This opinion constitutes the finding of fact and conclusions of law by the Court

following a <u>Fatico</u> hearing held on October 20-21, 2005 and post-hearing briefs

submitted by Artour Arakelian (the Defendant) and the Government on January 12, 2006.

Prior to the <u>Fatico</u> hearing, the Court had rendered an opinion on September 8,

2005 denying Defendant's petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2241. The Court then scheduled a <u>Fatico</u> hearing for September 22, 2005[1] on the

applicability of the Government's claims for certain sentencing enhancements, including

obstruction of justice under the United States Sentencing Guidelines ("U.S.S.G.")

§ 3C1.1, based on the Government's claims of Defendant's perjury in his § 2241 petition,

and Defendant's failure to accept responsibility under U.S.S.G. § 3E1.1 (Application

Note 4).[2] The Court also scheduled a post-conviction hearing, pursuant to 28 U.S.C.

§ 2255, on September 26, 2005 on the Defendant's claim of ineffective assistance of

counsel in his § 2241 petition, due to the alleged failures by counsel, Richard M. Jasper,

---

[1] Sentencing was due to occur on September 22, 2005.
[2] The Presentence Report in this case has recommended an imprisonment range of 121-151 months and a sentence of 121 months in view of Defendant's Criminal History Category of I.

Jr. and Samuel Weissman, to advise him to accept a plea of 46-57 months of imprisonment in September 2004.

At the request of counsel, the <u>Fatico</u> hearing and sentencing were adjourned to October 20, 2005. The Court issued an order on October 14, 2005[3]: (1) stating that the <u>Fatico</u> hearing would relate to the Government's claim of obstruction of justice due to Defendant's alleged perjury and Defendant's failure to accept responsibility, and (2) making clear that since Defendant was contending he had received ineffective assistance of counsel in considering a plea offer but was not contending that he was not guilty of the charges in the indictment, <u>see</u> <u>United States v. Bicaksiz</u>, 194 F.3d 390, 398 n.9 (2d Cir. 1999), the Court was open to hearing evidence on his claim of ineffective assistance of counsel as a ground for departure under U.S.S.G. § 5K2.0.

On October 20, 2005, the Court opened the hearing with a statement explaining its order of October 14, 2005. The Court stated that if Defendant had changed his mind, he could, if he wished, present evidence of ineffective assistance of counsel due to a failure to give Defendant the benefit of professional advice in connection with a Government plea offer of 46-57 months' imprisonment. Sentencing Transcript from Oct. 20, 2005 Hearing ("Tr. 10/20/05") at 3-5.[4]

The Government first expressed its understanding that the defense would not be presenting evidence on the ineffectiveness of counsel issue and that the enhancements for more than fifty victims, sophisticated means, and an intended loss of between $2.5 million and $7 million were no longer being contested. <u>Id</u>. at 10. The Government then

---

[3] The Order was filed on October 18, 2005.
[4] The Court had concluded that since Defendant was not contending he was not guilty of the charges against him and was only contesting his sentence (<u>see</u> <u>Bicaksiz</u>, 194 F.3d at 398), the Circuit Court, rather than hearing a second appeal at a later date, would review his claim of ineffective assistance of counsel on any direct appeal if a hearing was held. Tr. 10/20/05 at 3-5.

stated that it would present one witness, Mr. Jasper, as former counsel to Defendant, on the Government's claim that the Defendant "has obstructed justice by making false statements in the declaration [of July 11, 2005] that was submitted to the Court in connection with the Section 2241 petition and in connection with the Supplemental Sentencing Memorandum" and was not entitled to sentencing credit for acceptance of responsibility. Id. at 10. The defense countered that, since it was withdrawing its ineffective assistance of counsel claim in its § 2241 motion and in its Supplemental Sentencing Memorandum, see Defendant's Supplemental Sentencing Memorandum ("Def. Supp. Sent. Mem.") at 8-12, the Government's claim for an enhancement for obstruction of justice was no longer appropriate. Defense counsel stated that the claim had been withdrawn not because Defendant had been presented with evidence of falsity but rather because "we have come to conclude that our ineffective assistance of counsel claim cannot be brought presentencing." Tr. 10/20/05 at 15.

The Government then called Mr. Jasper, one of Defendant's two prior counsel, who had provided an affirmation dated July 25, 2005 (GX-1)[5] contradicting the claims Defendant made in his July 11, 2005 declaration (GX-4) about the advice Mr. Jasper gave him in September 2004.[6] Mr. Jasper testified that, after he was retained in July 2004, he conferred with Defendant several times and that, although he explained to the Defendant that the Government could prove there had been more than fifty victims and a loss of over $2.5 million, the Defendant was "fixated" on having a plea offer of 37 months.[7] Tr.

---

[5] "GX" denotes Government exhibit; "DX" denotes Defendant's exhibit.

[6] The Defendant's declaration had been submitted in support of his § 2241 petition and Supplemental Sentencing Memorandum. See Def. Supp. Sent. Mem. and Defendant's § 2241 Petition, DX-C.

[7] In this case, the Defendant had been caught red-handed in the offices of Lexington Royce Inc. with checks from victims in his possession. He was President of Lexington Royce, had caused its incorporation in the fall of 2003, leased its office space, opened its bank accounts, hired its only employee (a receptionist/secretary), arranged for the printing of flyers falsely asserting that the company had been in

3

10/20/05 at 32-34. Mr. Jasper stated that, after the first superseding indictment, he had told the Defendant that he faced a sentence of over ten years if he went to trial, id. at 31, and, in an hour-long conversation, advised the Defendant to accept a plea offer by the Government with a Guidelines sentencing range of 46 to 57 months. Id. at 37-40. Mr. Jasper testified that the Defendant reiterated that he did not believe that the Government could prove the enhancements, despite Mr. Jasper's explanations as to how they could be proved; that the Defendant insisted he would not accept a plea agreement of over 37 months; and that the Government could make a better offer. Id. at 39-40. Mr. Jasper also stated that he told the Defendant that he would not have to pay Mr. Jasper's $15,000 for trial services, as provided in his retainer agreement, if he took the plea offer. See GX-3.

Thereafter, the defense called Samuel Weissman, co-counsel to Mr. Jasper, who testified that he had not advised Defendant to accept the Government's plea offer of 46-57 months because the Defendant was unable to allocute to his guilt. Id. at 120-22. Mr. Weissman stated that the Defendant had instructed him to try to get a plea offer from the Government of 37 months, id. at 134-35, which Mr. Weissman attempted by a letter to the Government dated September 28, 2004. See GX-8.

The defense also called Defendant's father and two of Defendant's friends to rebut Mr. Jasper's testimony. Two of these witnesses testified in substance that, at a meeting on October 20, 2004, Mr. Jasper had told them that he could "do better than 46 months." Tr. 10/20/05 at 189, 236, 258-59. The third stated that, although he was there at that meeting, Mr. Jasper had made such a statement in December or January. Id. at 249-50. The Defendant then testified that, although Mr. Jasper had advised the Defendant to

existence for twenty years and had expertise in foreign exchange trading, and sent approximately $2 million received from the victims to accounts which had no indicia of being engaged in foreign exchange trading.

take the 46-57 month offer, <u>see</u> Sentencing Transcript from Oct. 21, 2005 Hearing ("Tr. 10/21/05") at 319, his understanding from their conversation was that Mr. Jasper was saying that if the Defendant paid Mr. Jasper money to hire him as his trial attorney, Defendant could get a better offer from the Government. <u>Id</u>. at 284-85, 287. In his post-hearing brief, the Defendant argues that he received ineffective assistance of counsel from Mr. Jasper and ineffective advice from Mr. Weissman in failing to advise Defendant to take the Government's plea offer of 46-57 months. <u>See</u> Defendant's Post Hearing Memorandum at 8-11.

**DISCUSSION**

**I. Obstruction of Justice**

The Government claims that Defendant should get a sentencing enhancement because he obstructed justice in this case by committing perjury in his § 2241 petition. According to <u>United States v. Agudelo</u>, before applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of the evidence:

> [T]hat the defendant 1) willfully 2) and materially (3) committed perjury, which is a) the intentional b) giving of false testimony c) as to a material matter . . . In other words, before imposing the adjustment, the district court must find that the defendant consciously acted with the purpose of obstructing justice.

414 F.3d 348, 348 (2d Cir. 2005) (internal citations omitted). In <u>United States v. Dunnigan</u>, the Supreme Court defined perjury as "giv[ing] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." 507 U.S. 87, 94, 113 S. Ct. 1111 (1992).

The Government asserts that the following statements contained in Defendant's declaration in support of his § 2241 Petition, <u>see</u> DX-C of Def. Supp. Sent. Mem., are perjurious and amount to obstruction of justice under U.S.S.G. § 3(c)(1).

> 2.    Mr. Jasper said that if I was not going to hire him I should consider taking the plea offer. He told me I should not go to trial with Mr. Weissman. I understood Mr. Jasper to mean that if I hire him, he could get me a better plea than 46 months.
>
> . . . .
>
> 5.    If Mr. Jasper had told me the best thing for me to do was to take the 46 month plea offer, I would have taken the offer.

GX-4.

Based on the circumstances in this case and the testimony of Mr. Jasper, Mr. Weissman, and the Defendant, the Court concludes that Defendant's declaration and testimony about Mr. Jasper was intentionally not truthful and therefore constitutes an obstruction of justice.

### a)    *Based on the Context of Events During This Case*

The original indictment in this case was filed on May 10, 2004. On May 13, 2004, two weeks after Mr. Weissman filed his notice of appearance, the Defendant was arraigned on the indictment. The decision of <u>U.S. v. Blakely</u>, 124 S. Ct. 2531 (2004), issued on June 23, 2004, raised the possibility that enhancements over the Guideline base offense level require a jury determination of proof beyond a reasonable doubt. Mr. Jasper was first consulted about the case in early July 2004 and was paid $5,000 as a partial retainer on or about July 27, 2004. <u>See</u> GX-2, Receipt dated July 27, 2004. Mr. Weissman advised the Government by letter dated August 12, 2004 and the Court by letter dated September 7, 2004 that Mr. Jasper had been retained as co-counsel. On

September 8, 2004, Mr. Jasper and the Defendant signed a retainer agreement providing for $15,000 for services pre-trial and $15,000 if the case went to trial.  See GX-3, Retainer Agreement.

On September 23, 2004, Defendant pleaded not guilty to a first superseding indictment containing three Blakely enhancements, totaling twenty-nine levels of offense (108-131 months).  That evening, the Government conveyed a plea offer in the 46-57 month sentencing range to Defendant's counsel.  Defense counsel had discussions with the Defendant about the plea offer between September 24, 2004 and September 30, 2004, when a second superseding indictment was returned.

On November 22, 2004, approximately two weeks before the trial scheduled for December 8, 2004, the Defendant pleaded guilty to the second superseding indictment containing four Blakely enhancements and two levels deducted for acceptance of responsibility, totaling thirty-two levels of offense (121-151 months).  Prior to his plea of guilty to all counts, the Defendant reviewed with his counsel a Pimentel letter in which the Government expressed its view that the Defendant was facing 121 to 151 months of imprisonment if he pled guilty.  During the plea allocution, the Defendant responded affirmatively that he was fully satisfied with his attorneys, Mr. Jasper and Mr. Weissman, and "with the representation and legal advice they have given [him] in this case."  See Transcript of Nov. 22, 2004 Hearing ("Tr. 11/22/04") at 4-5.  If in late September the Defendant had understood Mr. Jasper to be advising him that, if he hired him, Mr. Jasper could get him a better plea than the Government's offer of 46-57 months,[8] it is unlikely that on November 22, 2004 Defendant would have expressed satisfaction with Mr.

---

[8] Defendant testified that this was his understanding at the Fatico hearing.  Tr. 10/21/05 at 284-85, 287.

Jasper's prior legal advice, just after the Pimentel letter made it clear that Defendant was subject to a 121-151 month sentence of imprisonment if he pleaded guilty.[9]

After the United States Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), the defense filed a lengthy pre-sentencing memorandum on March 7, 2005, arguing that the Guideline calculation based on intended loss overstated the Defendant's role and culpability and that downward departures should be considered.[10] United States v. Orton, 73 F.3d 331, 334 (1st Cir. 1966). The memorandum asked the Court to consider a sentence of 24-36 months.

On March 16, 2005, the Government submitted sixty-one victim impact statements. By letter dated March 18, 2005, the Government responded to Defendant's sentencing memorandum, arguing that the Defendant was a manager of a sophisticated scheme to defraud more than fifty victims of more than $4 million and should be sentenced, after a deduction of two levels for acceptance of responsibility, to 121-151 months of imprisonment.

---

[9] Mr. Jasper made clear on the record that the Defendant was not pleading guilty pursuant to a plea agreement nor to the enhancements contained in the second superseding indictment. See Tr. 11/22/04 at 2, 16. At that time, the June 23, 2004 Supreme Court decision in Blakely had raised "a host of immediate, significant and perplexing practical questions for federal criminal defense attorneys." Ian Weinstein & Nathaniel Z. Marmur, Federal Sentencing During the Interregnum: Defense Practice as the Blakely Dust Settles, 17 Fed. Sent. R. 51, 51 (Oct. 2004). The defense did not waive its right to jury determinations under Blakely and as of November 22, 2004, without a Court decision to impanel a jury for sentencing (id. at 53), the defense had avoided the impact of the Blakely upward enhancements included in that second superseding indictment letter. Sentencing was set for February 23, 2005. In January 2005, the Supreme Court decision in United States v. Booker, 125 S. Ct. 738 (2005), preserved judicial sentencing under the Guidelines subject to the provisions of 18 U.S.C. § 3553(a), eliminating any defense hope that the impaneling of a jury might lead to plea offer lower than the Guidelines.

[10] The Defendant's sentencing memorandum stated that departures should be allowed because of overlapping enhancements, lack of personal profit, the limited scope of Defendant's participation in the scheme, Defendant's lack of sophistication, aberrant behavior, disparity with sentences of similarly situated Defendants, and a combined aggregation of departure factors that took the case out of the Guidelines, and that the Government's position on sentencing was overly harsh in the light of the background, character, history, and future of the Defendant. See Defendant's Sentencing Memorandum, Mar. 7, 2005.

At the sentencing hearing on March 23, 2005, the Government stated its understanding that the defense would not be calling any witnesses and that the Government wished to present the testimony of Angela Otero, the secretary employed by the Defendant at Lexington Royce, to testify as to the Defendant's managerial role in the offense. The defense indicated that it would not be presenting witnesses and started to reiterate its argument for minimal role. At that point, the Court stated that it had read the victim impact statements and found them compelling. The Court also indicated that there were a number of statements in the defense and prosecution's memoranda that related to factual matters and were not evidence before the Court. The Court stated, "I really think you want to think very seriously whether you want to go ahead on sentencing and not present evidence and not do anything to relieve yourself of a responsibility for all the criminal acts conducted here." Transcript of March 23, 2005 Hearing ("Tr. 3/23/05") at 5.

After a conference with the Defendant at the defense's request, the sentencing was postponed for two weeks. See Tr. 3/23/05 at 6. After further defense adjournments on consent, the Court scheduled a sentencing hearing for May 18, 2005.

Prior to May 18, 2005, the Court received two letters from the Defendant on May 13, 2005 and May 16, 2005. In the four-page handwritten letter received on May 13, 2005, Defendant stated that he "was offerd [sic] 46 months by the government" and then stated, "I did not take it at that time. I hired another attorny hopeing [sic] that I would get less time." The Defendant made no suggestion in that letter that Mr. Jasper had not advised him to take the plea offer of 46-57 months or that he understood Mr. Jasper to mean that if Defendant hired him, Mr. Jasper could get him a better plea than 46 months.

If Defendant believed that Mr. Jasper had told him in September 2004 that he could get him a better plea than 46 months, it is highly likely that the Defendant would have made that claim in his letter received by the Court on May 13, 2005.

At the conclusion of the five-page typed statement by Defendant received by the Court from Mr. Weisman on May 16, 2005, the Defendant stated that the Court had made earlier statements warning him that if he went to trial and was found guilty, the Court would be unable to be lenient with the Defendant in sentencing, so the Defendant pleaded guilty. Defendant then asserted, "the Court is now indicating it will give me the maximum sentence if I do not cooperate . . . I also do not believe my counsel has represented me effectively and that I have been sold down the river by the system. I want to withdraw my guilty plea and have a trial with new counsel. I cannot afford to hire counsel and request that counsel be appointed for me." [11] Defendant's Letter to Court, dated May 16, 2005. There is no mention in this letter of a promise of a sentence lower than 46 months made by Mr. Jasper or anyone else, nor does Defendant contend that he was not advised to take the plea offer by Mr. Jasper. Id.

The obvious conclusion to be drawn from all of this is that the decision in Booker, which clarified that jury determinations of Guideline enhancements would not occur, and the Court's statements that the defense would be wise to present evidence at the Fatico hearing in order to get the minimal role and other departures requested in the defense letter of March 3, 2005, caused the Defendant to assert ineffective assistance of counsel.

---

[11] Accordingly, the Court ensured that the C.J.A. attorney assigned for the day was present in the Courtroom on May 18, 2005. However, Defendant had retained or was in the course of retaining present counsel. See Transcript of Hearing on May 18, 2005 ("Tr. 5/18/05 ") at 1-9. Present counsel has determined not to move to withdraw the plea but rather to claim ineffective assistance of counsel, see Tr. 10/21/05 at 278-79, and on September 9, 2005, Defendant brought a § 2241 petition claiming ineffective assistance of counsel and seeking to take advantage of the 46-month sentence offered by the Government on September 23, 2004.

During that time period, Defendant was not claiming any failure by Mr. Jasper to advise him properly in connection with the 46-57 plea offer made by the Government on September 23, 2004.

### b) Based on Mr. Jasper's Testimony

The Court next examines Defendant's credibility based on Mr. Jasper's testimony. Mr. Jasper testified that, after his retention, he reviewed the Lexington Royce bank records, flyers, wire transfers, certificate of incorporation, and other discovery received from Mr. Weissman on a rolling basis. Tr. 10/20/05 at 26. Mr. Jasper stated that he had concluded that the likelihood of success was dim, see id. at 29, and that by about August of 2005, he told the Defendant that he should seek a plea and not go to trial. Id. at 30. Mr. Jasper said that he advised the Defendant that he "could be looking at double-digit time" (10 years or more) if he went to trial because of the amount of loss, the number of victims totaling fifty or more, and other probable enhancements. Id. at 30-31.[12] Even though Mr. Jasper pointed out that the Defendant had caused the printing of the false and misleading flyers that were mailed to the victims and that there were Federal Express records showing the receipts of funds from more than fifty victims, see id. at 32-34, the Defendant rejected Mr. Jasper's advice, see id. at 32, and was adamant that 37 months was the correct sentence because the Defendant did not think the Government could prove he had participated in defrauding fifty victims.

After the Defendant's arraignment on the superseding indictment, Mr. Jasper received calls from the Government and Mr. Weissman relaying a plea offer of 46-57

---

[12] Mr. Jasper testified that he never at any time had any difficulty in communicating with the Defendant or any time when he believed the Defendant did not understand what he was saying to him. Tr. 10/20/05 at 22. The Defendant has never required an interpreter or an explanation of English words in this proceeding. Id. at 289-90.

months of imprisonment. Id. at 34. The offer was of limited duration. Id. Mr. Jasper met the Defendant for about an hour on September 27, 2004, see MDC Log for September 27, 2004, included in Government's Post-Hearing Memorandum, dated Jan. 12, 2006, and "talked about the offer, talked about what he was facing." Tr. 10/20/05 at 39. Mr. Jasper testified that he told the Defendant, "the 46-57 months, I couldn't see how he could do better than that," id., and "If he were my son, that I would advise him to take this plea. It was something that had to be jumped on. You couldn't let that offer go by." Id. In reference to the plea offer that the Government was extending and the 37-month figure on which Arakelian was fixated, Mr. Jasper stated, "I told him you would have to be crazy to go to trial for nine months . . . You don't go to trial for nine months exposing yourself to potentially double digit time for nine months." Id. at 40. Mr. Jasper testified, "I knew that they were not going to come down lower than that 40 – [46]." Id. at 40-41. When the Government asked whether he communicated that knowledge to Mr. Arakelian, Mr. Jasper answered, "Yes I did . . . He said 37 months . . . I'm not going to take anything more than that." Id. at 41.

Mr. Jasper also testified that paragraph two of Defendant's declaration was "not true. I never promised him I could get a better offer for him than 46 months . . . I never told him that he shouldn't go to trial with Mr. Weissman. I told him that he only – if he wasn't going to go to trial that he didn't need – that he wouldn't need me, that he wouldn't have to pay a trial fee." Id. at 42. With regard to the sentence in Arakelian's declaration that reads, "Mr. Jasper said that if I was not going to hire him, I should consider taking the plea offer," Defendant's Declaration ¶ 2, DX-C, Def. Supp. Sent.

Mem., Mr. Jasper responded, "It's not true.  I told him that he would only need me if I was going to go to trial.  That was my purpose . . . I told him to take the plea." Id. at 43.

Mr. Jasper also testified that he "told Mr. Souren Arakelian, Mr. Artour Arakelian's father, very strongly and adamantly, that I had told his son to take the plea.  And, I told Mr. Arakelian that if Artour Arakelian were my son, I would have him take the plea." Id. at 46.  Mr. Jasper continued, "I told Vinny [Vitaliy Zagoruyko] the very same thing, that if he were my son he should take it, and that he should take the plea." Id. at 47.[13] [14]

c)    *Based on Mr. Weissman's Testimony*

Mr. Jasper's testimony that the Defendant rejected the Government's plea offer of 46-57 months and instead wanted 37 months is corroborated by Mr. Weissman's testimony to the same effect.  Id. at 134, 160-61.

---

[13] Mr. Jasper did testify erroneously that he believed he had reviewed a Pimentel letter with the Defendant at that time.  Tr. 10/20/05 at 70-79.  Mr. Jasper was unable to refresh his recollection, having turned over his papers to incoming counsel.  Id. at 57.  Nevertheless, on its face, the first superseding indictment with its enhancements required a sentence of 108-135 months if the Defendant went to trial and was convicted of the enhancements.  On cross examination by Defendant's counsel, Mr. Jasper acknowledged that his sentencing memorandum dated March 3, 2005 (DX-4) asked for a sentence of 24-36 months but stated that it was "advocacy."  Tr. 10/20/05 at 87.

[14] Defense counsel confronted Mr. Jasper on cross examination with Mr. Souren Arakelian's declaration dated June 27, 2005 (GX-5).  Mr. Jasper denied that he had ever said he could do better that the 46-month plea offer at a meeting with Mr. Souren Arakelian, Vitaliy Zagoruyko, and Mr. Tsaryuk in late October 2004 or at any time.  Tr. 10/20/05 at 53.  When confronted with the declarations of Mr. Zagoruyko and Mr. Tsaryuk (GX-6), Mr. Jasper repeated his denials that he had never said he could do better than 46 months, see Tr. 10/20/05 at 53, and that he never said he could make a deal for as little as 24 months.  Id. at 58.  Mr. Jasper pointed out that the Government's offer had been withdrawn well before late October, and that, when he was receiving a fee to go to trial on October 20, 2004, plea negotiations had ceased.  Id. at 52-53.  The Court has little confidence in the testimony of these three defense witnesses.  Mr. Souren Arakelian appeared to have rehearsed his testimony and demonstrated an inability to understand English.  There is no showing that Mr. Souren Arakelian, Mr. Zagoruyko, or Mr. Tsaryuk had any familiarity with criminal procedures and understood the status of the proceedings at the time of their discussions with Mr. Jasper.  Mr. Zagoruyko disputed that the statement attributed to Mr. Jasper occurred at the October 20, 2004 meeting, and Mr. Tsaryuk initially remembered the date of the statement as being considerably later.  Accordingly, if the statement was made, it may have reflected the sentencing memorandum's request for as low as 24 months.

The testimony of Mr. Jasper and Mr. Weissman that the Defendant insisted on 37 months is corroborated by Mr. Weissman's letter to the Government seeking a lower plea offer of 37 months. <u>See</u> Tr. 10/20/05 at 135-65; GX-8.[15] In fact, after Mr. Weissman told the Defendant that his 37-month sentence "didn't fly," Defendant told Mr. Weissman to tell the Government he would accept 30 months. Tr. 10/20/05 at 168. The Defendants' intransigence is also reflected by Mr. Weissman's testimony that, while the plea offer was pending, the Government offered to provide a reverse proffer to the Defendant several times, but the Defendant rejected the offer to hear the Government's proof. <u>Id</u>. at 183-84. Thus, the testimony of Mr. Weissman and Mr. Jasper is consistent as to the Defendant's inflexible position on the Government's plea offer.

Mr. Weissman's testimony also tends to corroborate Mr. Jasper's testimony that Mr. Jasper had advised the Defendant's father that the Defendant could be facing ten years in jail prior to the 46-57 month plea offer. <u>Id</u>. at 167. The Defendant's father told Mr. Weissman that Mr. Jasper had told him that the Defendant was facing ten years. <u>Id</u>. Mr. Weissman also testified that he had never heard Mr. Jasper convey to anybody, in words or substance, that he thought he could get a better result than 46 months. <u>Id</u>.

### d)      Based on Defendant's Own Testimony at the <u>Fatico</u> Hearing

At the <u>Fatico</u> hearing, Defendant testified that he had started meeting with Mr. Jasper in June, <u>see</u> Tr. 10/21/05 at 299, Defendant had met Mr. Jasper three times before hiring him, <u>id</u>. at 300, 303, 307, and that he had hired him in August 2004. <u>Id</u>. at 283. Mr. Jasper was getting all the evidence and information from Mr. Weissman. <u>Id</u>. at 317. By letter dated August 12, 2004, Mr. Weissman notified the Government that Mr. Jasper

---

[15] The offer of 46-57 months was withdrawn by September 30, 2004, the date of the second superseding indictment.

would be co-counsel on the case and would be getting in touch with the Government. See Def. Supp. Sent. Mem., DX-A. On September 13, 2004, Mr. Jasper appeared in Court as co-counsel to Mr. Weissman. Obviously, since Mr. Jasper had met with the Government, the Government called Mr. Jasper to convey the plea offer to the Defendant. See Defendant's 7/11/05 Declaration ("Def.'s Decl.") ¶ 2. [16]

Defendant testified that Mr. Jasper's advice about the plea offer was only that "If I was not to hire him, I should really consider the plea." Tr. 10/21/05 at 284. Nevertheless, Defendant acknowledged that he had earlier told Mr. Jasper "what was going on," that "I need to get the best plea bargain possible," id. at 300, and that he was aware that there was a fraud going on at Lexington Royce. Id. at 299-301. Defendant said that he talked to Mr. Jasper about how the Guidelines worked and that the Defendant had a copy of the Guidelines, as Mr. Jasper and Mr. Weissman previously testified. Id. at 307. The Defendant also acknowledged that he had reviewed with Mr. Jasper how those Guidelines would apply in his case, see id. at 308, and that during that period he had a copy of the Blakely decision. Id. at 308-09.

Not long thereafter, however, the Defendant testified to the contrary that Mr. Jasper never discussed the Defendant's exposure under the Guidelines until after his

---

[16] Defendant's testimony that Mr. Jasper said "I should really consider the plea," Tr. 10/21/05 at 284, is inconsistent with the Defendant's statement in his Declaration that "If Mr. Jasper had told me the best thing for me to do was to take the 46 month plea offer, I would have taken it." GX-4, Def.'s Decl. ¶ 5. The superseding indictment made clear that the Government was contending that the Guideline sentence would be under U.S.S.G. § 2B1.1, namely, a base offense level of 7, enhancements of a) 18 levels for an intended loss of over $2.5 million and less than $7 million; b) 4 levels for more than fifty victims, and c) 2 levels for use of sophisticated means, for a total of 31 levels (imprisonment for 108-135 months) if the Defendant went to trial. In fact, these enhancements were contained in the indictment, as had been made clear to the Defendant before his meetings with Mr. Jasper and Mr. Weissman during the Court conference after his arraignment on the superseding indictment on September 23, 2004. Tr. of Hearing on September 23, 2004 at 21-23.

guilty plea, see id. at 319-20,[17] or that he was facing a sentence of approximately ten

years in prison if convicted at trial. Id. at 312, 317. The Defendant further testified that,

when he did meet with Mr. Jasper after the first superseding indictment was filed on

September 23, 2004, they never discussed the case or went over the paperwork. Id. at

312. Defendant said, "It never happened because he wasn't fully retained and that was

his concern. He did not want to do work." Id. at 318. The Defendant testified that at his

September 27, 2004 meeting with Jasper, "I asked him what his professional advice is

and what did he think, what should I do. And he told me the way everything goes and

I'm still on $10,000 retainer and I still can't get all of the money paid, and if you cannot

afford to hire me or you're not going to hire me on the case, you should really consider it

about taking the 46 months." Id. at 318.[18] The Defendant denied telling Mr. Jasper that

he wanted 37 months except after he pleaded guilty, id. at 319, and denied that Mr. Jasper

told him that (a) the Government's offer was a generous offer; (b) "he would be crazy not

to take it"; or (c) "if you were my son I would advise you to take that offer." Id. at 322-

23.

     The Defendant maintained that once Mr. Jasper was partially retained, all Mr.

Jasper would talk about was getting the remainder of the payments due under his retainer

agreement. See GX-4. The Defendant's testimony is that he asked Mr. Jasper, "What

should I do about the 46 months? Should I take it and finish and put everything

---

[17] The record shows the Defendant's friend Vitaliy Zagoruyko paid Mr. Jasper a partial retainer of $5,000 on July 27, 2004, see GX-2, and that on September 8, 2004, the Defendant signed an agreement to pay Mr. Jasper $15,000 for his services pre-trial and an additional $15,000 if the case went to trial. GX-4. The full retainer was to be paid by September 13, 2004. Id.

[18] The $10,000 figure contradicts the Defendant's declaration of July 11, 2004 that "as of the day he came to see me about the 46 month plea offer, Mr. Jasper had been paid $15,000." GX-3, ¶ 3. The figure also contradicts Defendant's declaration that the full amount of Jasper's fee was $35,000, id., and Mr. Souren Arakelian's declaration of June 27, 2005, see ¶ 3, that Mr. Jasper was paid a total of $35,000. However, the figure is consistent with Mr. Jasper's testimony as to the payment received as part of the retainer agreement ($15,000 for his services pre-trial and another $15,000 if the case went to trial). See GX-4.

behind?", Tr. 10/21/05 at 319, and Mr. Jasper did not advise Defendant to take the offer of a Guideline plea of 46-57 months. Defendant also claims that Mr. Jasper did not to go over the superseding indictment charging enhancements, which could result in a Guideline sentence of 108-135 months in the event of trial, even though there was an imminent trial date of early October 2004.

Defendant's claim that Mr. Jasper did not advise him about his exposure under the Guidelines until after he pleaded guilty does not comport with reality. It is not logical that Mr. Jasper was only willing to discuss Defendant's exposure after he had been fully paid to proceed to trial, given all of Defendant's meetings with Mr. Jasper so that Defendant could get a second opinion, see id. at 283, and get the best plea possible. Id. at 300. Since Defendant's testimony is that he had acknowledged to Jasper that he knew Lexington Royce was a fraud, see id. at 299, 301, the obvious inquiry for an attorney is to determine, from the discovery and discussions with the Defendant and the Government, what Guidelines sentence the Defendant could face under the Guidelines for fraud cases (U.S.S.G. § 2B1.1). The Defendant testified that he never discussed his exposure under the Guidelines with Mr. Jasper until Mr. Jasper received payment of the full amount of his retainer for trial. Id. at 316.[19] Defendant said, "Mr. Jasper told me he had to be fully hired before he came to court." GX-5; Def.'s Decl. ¶ 3. Mr. Jasper, however, had already appeared at a Court conference on September 13, 2004 and afterwards on October 4, 2004 and October 21, 2004. See Tr. 9/13/04, 10/4/04, and 10/21/04. These appearances by Mr. Jasper are totally inconsistent with Defendant's claim that Mr. Jasper was unwilling to do any work until he received the full amount of his retainer. Tr.

---

[19] Defendant testified that Mr. Jasper was not hired as his lawyer until sometime after October 20, 2004 because the check bounced. Tr. 10/21/05 at 314; GX-1 at ¶ 15.

10/21/05 at 315-16. Furthermore, Defendant's testimony contradicts his earlier testimony that Mr. Jasper went over the Guidelines with him and explained how they applied to his case in July/August 2004. Id. at 307- 08. Given that Mr. Jasper is an experienced trial attorney and member of the CJA Panel for a number of years, Defendant's testimony that he reacted as such to the circumstances and questions described above is not credible.

Based on all the facts and circumstances, including the demeanor and testimony of the witnesses, the Government has satisfied its burden of proving by a preponderance of the evidence that the Defendant made a willful, intentional effort to provide false testimony to the Court by stating, "If Mr. Jasper had told me the best thing for me to do was to take the 46 month plea offer, I would have taken the offer." Def.'s Decl. ¶ 5. In his declaration, Defendant also described Mr. Jasper's advice as follows: "Mr. Jasper said that if I was not going to hire him, I should consider taking the plea offer. He told me that I should not go to trial with Mr. Weissman. I understood Mr. Jasper to mean that if I hired him, he could get m[e] [sic] a better plea than 46 months." Id. ¶ 2. This was an intentional distortion of Mr. Jasper's advice. The Defendant was advised by Mr. Jasper not to go to trial, nothing more. The Defendant had decided to conduct his own negotiation with the Government by a counteroffer of 37 months through Mr. Weissman. Tr. 10/20/05 at 124). That counteroffer was rejected, and as a result, Defendant had to arrange to pay Mr. Jasper for trial. Thus, in his declaration the Defendant intentionally conflated his conversation with Mr. Jasper to mislead the Court.

The Court concludes that Mr. Jasper fully advised the Defendant of his exposure under the Guidelines and the Blakely enhancements and advised the Defendant to take the plea offer of 46-57 months of imprisonment after his arraignment on the first

superseding indictment.  Accordingly, the Court finds the statements to the contrary in

the Defendant's July 11, 2004 declaration were intentionally false and perjurious and

were intended to obstruct justice during his sentencing.  The Defendant was seeking to

reinstate the Government's plea offer and obtain a fixed sentence of 46 months.  <u>See</u>

Defendant's Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 at 5-9.  Perjury to

achieve this purpose constitutes obstruction of justice.  <u>United States v. Lincecum</u>, 220

F.3d 77, 80 (2d Cir. 2000) (<u>per curiam</u>); <u>United States v. Case</u>, 180 F.3d 464, 467 (2d Cir.

1999); <u>see</u> U.S.S.G. § 3G.1.1.

## II.  Acceptance of Responsibility

The Government claims that Defendant should receive a sentencing enhancement

for failure to accept responsibility.  The Defendant, however, is still entitled to a

reduction of two levels under the Guidelines for his acceptance of responsibility for the

crimes he committed pursuant to U.S.S.G. § 3F1.1.  The Defendant has truthfully

admitted "the conduct comprising the offense of conviction," and his obstruction of

justice conduct does not comprise any additional relevant conduct for which he is

accountable under U.S.S.G. § 1B1(3) Relevant Conduct Application Note 1(a).

Application Note 4 of U.S.S.G. § 1B1 states that conduct resulting in an

enhancement under § 3C1.1 (obstructing or impeding the administration of justice)

ordinarily indicates that the Defendant has not accepted responsibility for his <u>criminal

conduct</u> (emphasis added).  Here, however, the Defendant is not contesting his criminal

conduct but rather seeks to reduce the penalty for that conduct by claiming ineffective

assistance of counsel in connection with a plea offer.  Accordingly, the Court finds that

the Defendant is still entitled to the two level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).[20]

### III. Defendant's Claims of Ineffective Assistance of Counsel

In view of the different manner in which the Defendant treated each of his counsel, the Court must separately consider his claims of ineffectiveness of counsel under Strickland v. Washington, 466 U.S. 668 (1984).

To establish a claim for ineffective assistance of counsel, a petitioner must demonstrate (1) that his counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the petitioner. Id. The performance of counsel is deficient if it "fell below an objective standard of reasonableness" under "prevailing professional norms." Id. at 688.

In addition to demonstrating deficient performance by counsel, a petitioner must show that the deficiency had an effect on the result and that the error was prejudicial to the petitioner. See Strickland, 466 U.S. at 691-96. A petitioner demonstrates prejudice by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687, 694.

There is "a strong presumption that counsel's conduct falls within the wise range of reasonable professional assistance," and "there are countless ways to provide effective counsel in a given case." Id. at 689. In asserting these claims, the petitioner has the burden of overcoming the presumption that his counsel's representation was reasonable. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all

---

[20] Because the Defendant's guilty plea did not permit the Government to avoid preparing for trial, the additional level does not appear to be warranted.

significant decisions in the exercise of reasonable professional judgment." Id. at 690. As the Supreme Court stated in Strickland,

> Judicial scrutiny of counsel's performance must be highly deferential . . . it is all too easy for a court, examining counsel's defense after it has proved unsuccessful to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. (emphasis omitted).

The Strickland test applies to ineffective assistance of counsel claims in the context of the plea bargaining process. See Hill v. Lockhart, 474 U.S. 52, 57 (1985); Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996). Counsel conveying a plea offer to his or her client must "give the client the benefit of counsel's professional advice on this crucial [decision whether to plea guilty]." Boria, 99 F.3d at 497 (citing 1 Anthony G. Amsterdam, trial manual 5 for the defense of criminal cases § 201 (1988)). "As part of this advice, counsel . . . should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (internal citations omitted).

The American Bar Association Standards for Criminal Justice 14-3.2 "Responsibilities of Defense Counsel" contains certain relevant provisions concerning the obligations of counsel in considering plea offers:

> a) Defense counsel should keep the defendant advised of developments arising out of plea discussions conducted with the prosecuting attorney, and should promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney.

      b)      To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

. . .

ABA Standards for Criminal Justice 14-3.2 (3d ed. 1999).

Its commentary states in pertinent part:

A defendant needs to know, for example, the probability of conviction in the event of trial. Because this requires careful evaluation of problems of proof and of possible defenses, few defendants can make this appraisal without the aid of counsel. A defendant also needs to know the probable sentencing outcome of a plea of guilty or *nolo contendere*, as opposed to conviction at trial.

Id. Thus, pursuant to case law and the ABA standards, defense counsel has several obligations in giving the client his professional advice during the plea bargaining process. Significantly, however, counsel is not required to advise the client on the ultimate issue of whether to plead guilty or not. Id. at 46. Accordingly, it is necessary to consider carefully the facts and circumstances facing defense counsel in this case.

### a) As to Mr. Jasper

Earlier in this opinion, the Court determined that the Defendant intentionally committed perjury in asserting that Mr. Jasper did not advise him that the Government's case against him was strong or of the possible jail sentence he faced if he went to trial. The Court also concluded that Mr. Jasper did advise Defendant to accept the 46-57 month offer and that Mr. Jasper did not advise the Defendant that, if he hired him, he could get the Defendant a better plea offer than 46-57 months. See supra pp. 17-18. These same findings apply to Mr. Jasper's conduct when the Court considers Defendant's request for

departure from the Guidelines under U.S.S.G. § 5K.2 for ineffective assistance of counsel.

The evidence demonstrates that Mr. Jasper advised the Defendant of the extent of his exposure under the Guidelines, the strengths and weaknesses of the case against him, and the alternative sentence to which he would be exposed if he went to trial. See Purdy, 208 F.3d at 45. He also advised the Defendant to take the offer and plead guilty. See Boria, 99 F.3d at 496-97. Thus, the Defendant's claim of ineffective assistance of counsel is denied as to Mr. Jasper.

### b) *As to Mr. Weissman*

Mr. Weissman was in a different position than Mr. Jasper. Defendant has acknowledged that, although he told Mr. Jasper that he knew that fraud was going on and wanted the best plea bargain possible, see Tr. 10/21/05 at 300-01, he did not tell Mr. Weissman that he knew that what was going on with Lexington Royce was a fraud. Id. at 293, 302-03.[21]

The two-day hearing on October 20, 2005 and October 21, 2005 shed considerable light on the relationship between Mr. Weissman and the Defendant. When asked for his opinion of the strength of the Government's case at the time the "46-month" plea offer was made, Mr. Weissman testified, "Well, in my view the case was – I mean, there was clearly fraudulent activity, so the issue was not whether that is fraudulent activity, it is what Mr. Arakelian's involvement in this was." Tr. 10/20/05 at 114. Mr. Weissman testified that the Defendant refused to acknowledge that he had known that the

---

[21] Indeed, the Court had been concerned, in view of the Defendant having been caught red-handed, see supra p. 8 n.6, as to whether Mr. Weissman and Defendant were proceeding to trial without Defendant receiving proper advice about the advisability of entering a guilty plea and whether the Defendant's attorney's fees were being paid by an accomplice. See Opinion and Order filed 9/6/05; Tr. 9/23/04 and 10/15/04.

Lexington Royce operation was a fraud; that the Defendant maintained that he was acting in good faith; that he did not intend these people would forfeit all their money; and that he thought the investor's money was going to be invested. Id.

Concluding that the jury's determination hinged on a good faith defense, Mr. Weissman testified that he gave the Defendant copies of the jury instructions on deliberate ignorance and on good faith, and told him "I don't make predictions about what a jury is going to do . . . ." Id. Mr. Weissman also testified that he told Defendant:

> [I]f the jury thinks you were burying your head in the sand, they're going to find you guilty. But, you know, if we can convince the jury that you were not the brightest fellow and you didn't understand what it was, what the intention of these others was going to be, they might find you not guilty.
>
> I don't – I have – never tell a client my prediction. I mean percentage or – I just tell them, you know, what the elements are and what, you know, what if – what the evidence – how the evidence is presented. And that's how I do it.

Id. at 114-15.

Similarly, Mr. Weissman testified that he did not give the Defendant an evaluation of the likelihood of success of the good faith defense that he believed was the crux of the case, id. at 114:

| | |
|---|---|
| THE COURT: | Did you, at any time, go through what acts this man that the government knew about? That he incorporated this incorporation [sic], that he had signed the lease for this corporation, that he had opened the bank accounts for this corporation, that he had flyers in his briefcase that showed that the corporation was telling lies about the length of time the corporation had been in existence; that he would, the jury would know that he was caught with these documents in his possession? |
| | Did you review those facts? |
| THE WITNESS: | Yes, we went through that over and over. Yes. |

| THE COURT: | You explained to him that that would go to his state of mind in the jury's determination as to whether he participated knowingly in this? |
|---|---|
| THE WITNESS: | Yes. I mean I had told him, This is what the government attorney would argue. And then I told him what we would have to argue and that – |
| THE COURT: | But you didn't tell him how the jury would – how the jury was likely to view these actions of his? |
| THE WITNESS: | You know, I – I did not make a prediction. I told him – I |
| THE COURT: | I didn't say you made any prediction. |
| THE WITNESS: | No. |
| THE COURT: | How the jury was likely to view it. |
| THE WITNESS: | You know, I mean, your Honor, other than saying if we were examining one piece of evidence or a document, other than saying this looks bad I didn't, other than, you know, I would address the certain documents. You know, this looks bad. This here looks pretty good. |
| | But I didn't ever give him a prediction about what the jury would do. |

Id. at 121-22.

Mr. Weissman's testimony also reflects that, after the arraignment on the first superseding indictment, when the Government's 46-month offer was received, Mr. Weissman did not explain to the Defendant the extent of his exposure if he went to trial, but relied on his previous discussions with the Defendant based on a 78-month sentence estimate by the Government.

| MS. STURM: | And did you give Mr. Arakelian the advice of counsel concerning the probable outcome of the case if he did not accept the 46 month offer? |
|---|---|
| MR. WEISSMAN: | Well, we had discussed that many times. I mean, when you say outcome you mean? |

| | |
|---|---|
| MS. STURM: | What sentence he might receive if he rejected the offer? |
| MR. WEISSMAN: | The exposure? |
| MS. STURM: | Yes. |
| MR. WEISSMAN: | We had gone through that many times with, you know – when the government made its initial offer they gave us a breakdown and I went through, you know, different possible breakdowns. |
| THE COURT: | What did you tell him was the possible outcome if he went to trial? |
| THE WITNESS: | Well, when I discussed that with him – <u>which was not at this time</u> – it was before the 46 months offer; but when I discussed that with him, I told him that if things worked out vis-a-vis the 78 months that the government was saying, I told him that he might not do more than what I thought, five years in jail. That's including the 15 percent good time. |

<u>Id</u>. at 116-17 (emphasis added).

| | |
|---|---|
| MS. STURM: | When the 46 month offer was conveyed by you to Mr. Arakelian, did he ask you what you thought he should do? |
| MR. WEISSMAN: | Yes. |
| MS. STURM: | So he sought your advice, is that correct? |
| MR. WEISSMAN: | Yes. |
| MS. STURM: | How did you proceed then? |
| MR. WEISSMAN: | Well, you know, first I said to him that the next step would be entering a plea and that you have to plead guilty. And I gave him some of the allocution questions and he seemed to, you know, not – you know, when I said you're giving up the right to be proven guilty beyond a reasonable doubt; he said, What can they prove here? His response is, What can they prove beyond a reasonable doubt? |

> And you know, I told him I cannot force him to plead guilty and he has to – he is going to be asked, are you pleading guilty because you are guilty? I told him, if you mess around with the Judge he is not going to even accept your plea.
>
> And I was also concerned about what he might do if he pleaded guilty; if he got through the allocution, what he might do at his probation interview.
>
> You know, he – so, I was very concerned and I expressed those concerns.

Id. at 120-21.

Thus, the evidence shows that Mr. Weissman did not give Defendant "the benefit of counsel's professional advice" on his exposure if convicted or on the critical decision of whether to plead guilty, see Boria, 99 F.3d at 497, and "never gave his client any advice or suggestion as to how to deal with the People's offered plea bargain." See id. at 498. Mr. Weissman failed to "inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy, 208 F.3d at 45.

The first superseding indictment contained enhancements to be proved to the jury which, under the Guidelines, exposed the Defendant to a sentence of 108 to 135 months, not 78 months. Seventy-eight to ninety-seven months was the figure if the Defendant secured a three-level credit for pleading guilty early and accepting responsibility for the crime, as Mr. Weissman later acknowledged. Id. at 78. Thus, the Defendant's exposure (pre-Blakely) under the original indictment was 108-135 months under the Guidelines. Nevertheless, Mr. Weissman advised the Defendant that, if he went to trial, he would not spend more than five years in jail.

THE COURT:                          Well, what did you say was the result if
                                    he went to trial at the time of that 78 month offer?

THE WITNESS (Weissman):  As I just said, I said, in my view, if you went to trial
                                    and were found guilty, I don't think you would be
                                    sentenced to, you know, there would be a
                                    sentencing range.  But, given the 15 percent good
                                    time, I said I don't think you'll do more than five
                                    years.

                                    So, my working number with him was 60 months in
                                    jail time.

THE COURT:                          But you didn't give him any indication of what the
                                    Court's sentence would be at the time of the 78
                                    offer if he went to trial?

THE WITNESS:                        No.  I mean for that I always – I say, you know, the
                                    final determination is, it's up to the Judge, but I'm
                                    telling my view of what different sentencing factors.

                                    And I said, you know, I advised him not to take the
                                    78.  I mean, when I told him about the 78, I mean,
                                    he didn't even want to talk about it.  But I went
                                    through it with him, all the government gave me,
                                    how they came to that.

THE COURT:                          Did you tell him what his exposure under
                                    the guidelines was?

THE WITNESS:                        Yes.  I mean, that's what I'm saying.  We went
                                    through the guidelines, the government gave me
                                    how they used the guidelines and came up with the
                                    78.

                                    And at that time I told him, you know, if we get this
                                    and this and then, you know, then I multiply it times
                                    85 percent, I told him I don't think in order to be
                                    found guilty you might not do more than five years
                                    in jail.

                                    So, I thought the 78 was bad.

THE COURT:                          You didn't tell him what the maximum might be, is
                                    that right?  Under the guidelines?

THE WITNESS:        Well, we went through each guideline.  I mean –

THE COURT:        He had the guidelines with him?

THE WITNESS:        Yes.  I gave him the chart and we went  through – the government gave me their breakdown and then I gave him, you know, maybe, an alternative breakdown.

THE COURT:        Did you tell him what the government's breakdown was if he went to trial?

MS. STURM:        Can we have a time period for this, your Honor?

THE COURT:        The time of the 78 months.

THE WITNESS:        Well, I didn't have anything from the government on that.  I mean, all they – I mean, basically at that time they were saying, you know, they were undecided about whether to seek an enhancement for his role in the offense but, you know, I'm telling you, you know, what I said to him.

Id. at 118-20.

MS. STURM:        What was your personal opinion about the 46-month plea offer?  Did you consider it to be a good offer in this case?

MR. WEISSMAN:        I considered it to be an offer that was to be considered in lieu of a trial because, as I said, I was under a sort of a working number that he faced that 60 months' jail time going to trial and losing.

Id. at 122.

Mr. Weissman therefore did not give the Defendant accurate information about his potential exposure after going to trial, which is critical for Defendant to make an informed decision.  See United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998) ("Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to

plead guilty"); see also Purdy, 208 F.3d at 46 (finding that defense counsel "adequately advised [Defendant] of the likely sentence he would face after trial" by advising Defendant of the strengths of the government's case against him and demonstrating those strengths in a mock cross examination).

In this case, Mr. Weissman misadvised the Defendant as to his exposure if he was convicted at trial because Defendant at that time was exposed to a 108-135 month sentence under the Guidelines. He also failed to give his opinion of the probable outcome if Defendant relied on the good faith defense and went to trial.[*] Mr. Weissman's failure to advise the Defendant as to the probable outcome at trial, and his seriously defective advice as to what sentence the Defendant was apt to receive under the Guidelines upon an adverse jury determination, lead the Court to conclude that Mr. Weissman's advice to the Defendant in connection with the plea offer was deficient.

The issue remains as to whether the Defendant was prejudiced as a result. See Strickland, 466 U.S. at 691-96. At the time of the plea offer, Mr. Weissman was counsel of record and lead counsel, and Mr. Jasper was to assist at trial. (Letter to the Court from Mr. Weissman dated September 7, 2004; 9/13/04 Tr. at 2). Mr. Weissman testified that he had his first and second consultations with the Defendant about the plea offer before Mr. Weissman notified Mr. Jasper of the plea offer on September 25, 2004. Tr. 10/20/05 at 134. Thus, at the time of Mr. Jasper's visit, the Defendant had already instructed Mr. Weissman to make a

---

[*] In view of his failure to observe the minimum Standards of Criminal Justice and his evident failure to comprehend the United States Sentencing Guidelines, Mr. Weissman should not appear in criminal cases in this Court until he has had C.L.E. instruction as to how the Guidelines operate and as to the ethical and professional standards of conduct for criminal defense attorneys.

counteroffer of 37 months to the Government.  <u>Id</u>.  With a counteroffer pending, the Defendant would not be open to accepting Mr. Jasper's advice to take the 46-month plea offer.  Mr. Weissman, in advising the Defendant that he faced only five years in prison if he went to trial, may have contributed to Defendant's unyielding behavior.  Nevertheless, Mr. Jasper testified that, even before the plea offer was made, the Defendant had become fixated on a sentence of 37 months. <u>Id</u>. at 32-34.

Furthermore, the Defendant's conduct in his conferences with Mr. Weissman suggests that his fixation with 37 months was such that Mr. Weissman's failure to advise him did not cause him to reject the offer.  When initially presented with the Government's 46-month offer, Mr. Weissman testified that Defendant "said he wanted to think about it."  <u>Id</u>. at 125.  The Defendant rejected the offer the next day.  <u>Id</u>. at 125, 134.  The Defendant insisted on the 37 months counteroffer even though Mr. Weissman testified that he "told him you don't make counteroffers," <u>id.</u> at 135, and that "I told Mr. Arakelian it's not a – you're not buying a used car.  I told him they have an offer, they're not going to change it.  They're not going to – like you are buying something.  But, he wanted 37, so I said let me see if I can convince them of something."  <u>Id</u> at 160-61. After the Government rejected the Defendant's counteroffer, Mr. Weissman testified that he relayed that to Mr. Arakelian and discussed the offer with him again "only to the effect that he wanted 37, they wanted 46, and that was – there was no shifting in his position or their position."  <u>Id</u>. at 161.  Later, in his redirect, Mr. Weissman clarified his discussion, stating, "when I got the reply from Ms.

Failla I had a discussion and that discussion is when Mr. Arakelian told me to tell Ms. Failla that he would take 30 months." Id. at 175; see also id. at 168, 177. Therefore, rather than reconsidering the Government's offer once it had rejected his counteroffer, the Defendant instead wanted Mr. Weissman to go back to the Government with an even lower counteroffer and say that the Defendant "would accept a 30 month plea agreement." Id. at 177. The Defendant's lack of open-mindedness about his sentence is reflected in his multiple rejections of offers of a reverse proffer for the Government to explain to him what the evidence was against him and the strength of the Government's case. Id. at 183-186.

After the Defendant had been notified of the Government's rejection of his 37-month counteroffer, the Defendant still had an opportunity to accept the Government's offer. By that time, Mr. Jasper had talked with the Defendant "about the offer . . . about what he was facing," id. at 39, and had told him the plea offer "was something that had to be jumped on. You couldn't let that offer go by," id., and that "he would have to be crazy to go to trial for nine months . . . You don't go to trial for nine months exposing yourself to potentially double-digit time for nine months." Id. at 40. At that point, Defendant had "accurate information upon which to make his decision to pursue further plea negotiations or go to trial." See Gordon, 156 F.3d at 380. Yet instead of taking Mr. Jasper's advice, the Defendant continued to be fixated on 37 months and attempted to bargain with the Government by another counteroffer of 30 months. Thus, the Defendant's conduct shows that he was intent on making his own decision about

how to negotiate with the Government and would have rejected the plea offer even if he had been properly advised by Mr. Weissman.

Even if Mr. Weissman's conduct had prejudiced the Defendant's consideration of the plea offer, it is questionable whether the Defendant should receive the benefit of that offer at the time of sentence. "Ineffective assistance is a constitutional violation of a defendant's rights and not a mitigating factor to be considered at sentencing or resentencing. Rather, a finding of ineffective assistance requires a remedy specifically tailored to the constitutional error." U.S. v. Carmichael, 216 F.3d 224, 227 (2d Cir. 2000). See also Gordon, 156 F.3d at 381 ("where there has been a finding of ineffective assistance of counsel . . . the remedy should be tailored to the injury suffered from the constitutional violation" (internal citation omitted)). As the Second Circuit stated:

> [W]e do not mean to suggest . . . that a defendant is necessarily entitled to specific performance of a previously spurned plea offer because his counsel had been constitutionally ineffective in failing to advise him whether to accept the offer. As we have already held, specific performance is not always the remedy best-suited to this constitutional violation. See Gordon, 156 F.3d at 381 (rejecting argument that specific performance of plea offer was sole remedy for counsel's ineffective assistance during plea negotiations); see also United States v. Day, 969 F.2d 39, 47 (3d Cir. 1992) (opining that although "the relief of 'specific performance' of a plea bargain is sometimes appropriate, "a second opportunity to accept a plea agreement ought not to be automatic"). After an appropriate hearing, the court might find that appellant would have spurned the offer, or that, if the offer was accepted, the court would have imposed a sentence that differed from the government's recommendation.

Carmichael, 216 F.3d at 227. In light of the Court's own reaction to the victim impact statements received in February 2005 prior to the scheduled sentencing, the Court does not believe it would have accepted such a plea bargain for 46 months and would have considered departing from the agreed upon plea. See

<u>Carmichael</u>, 216 F.2d at 227; <u>United States v. Berman</u>, 04 Civ. 1281 (RPP) (2005).

Furthermore, the Court is not convinced that the Guideline sentence has been computed properly.  The parties should advise the Court by April 19, 2006 of the reasons why the Government is no longer pursuing an enhancement for managerial role for the Defendant under U.S.S.G. § 3B1.1 and why the parties believe U.S.S.G. § 2B1.1(14)(B) is not applicable in light of the determinations in <u>Dunn, et al. v. Commodities Futures Trading Commission, et al.</u>, 519 U.S. 465 (1997), <u>Rosner v. Peregrine Finance Limited</u>, 1998 U.S. Dist. LEXIS 7170 (S.D.N.Y.), and <u>Commodities Futures Trading Commission (CFTC) v. Standard Forex</u>, 1996 U.S. Dist. LEXIS 14778 (E.D.N.Y.) (determining that the Treasury Amendment only excludes transactions in foreign currency between banks and financial institutions regulated by the Treasury and that the term "board of trade" would include both formally organized and informal associations of people, like Forex, engaged in the business of options to buy and sell foreign currencies).  If the Government and the probation office failed to compute the Guidelines sentence correctly, absent some defect in proof, that also might have led the Court to reject the plea bargain of 46 months.

The Defendant's claim of ineffective assistance of counsel is denied as to both Mr. Jasper and Mr. Weissman.  Sentencing will be held on April 27, 2006 at 2:00 p.m.

IT IS SO ORDERED.

Dated: New York, New York
April 26, 2006

_____
Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order sent to:

*Counsel for the Government:*

Michael J. Garcia, United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
Attn: Katherine Polk Failla / Marc Litt
Tel:    212-637-2324 / 2295
Fax:    212-637-2605

*Counsel for the Defendant:*

Cheryl J. Sturm, Esq.
387 Ring Road
Chadds Ford, PA 19317
Tel:    484-771-2000
Fax:    484-771-2008